NORMAN HOFFMAN, PLAINTIFF IN ERROR, V. STATE OF
NEBRASKA, DEFENDANT IN ERROR.
70 N. W. 2d 314

Filed May 6, 1955.  No. 33732

*Dryden & Jensen,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Ralph D. Nelson,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Norman Hoffman, identified herein as defendant, was charged with and convicted of the crime of motor vehicle homicide. § 28-403.01, R. S. Supp., 1953. He was adjudged to be confined in the State Reformatory. He prosecutes error to review the record of his conviction.

The defendant contests the sufficiency of the evidence to authorize a verdict of guilty. He and Billy Carlson, hereafter referred to as Carlson, were traveling westward on U. S Highway No. 30 in the early morning of May 16, 1954, in the 1949 Ford convertible automobile of defendant. The White Spot Service Station is near to, north of the highway, and east of Kearney. A 2 or 3 ton straight Chevrolet truck was serviced at the station. Its lights were checked and were found to be in serviceable condition. The lights on the sides of the truck were amber color, there were red ones on each rear corner, and a stop light on the back of the truck. The truck left the station, was driven out of the driveway, and westward on the highway.

The automobile of the defendant was at about 3:45 a. m. driven into and collided with the rear of the truck described above some distance west of the station. There were two persons traveling eastward on the highway and when they were 500 to 800 yards west of the station they saw the collision of the car and the truck. A spare tire was thrown into the air and over the highway. The noise made by the collision was heard. The truck twisted around to the left and then to the right down into the ditch on the north of the highway. The car collided with the rear of the truck on the north side of the highway, swerved towards the south, and traveled southwest to about the right-of-way fence of the Union Pacific Railroad Company. One of the men who witnessed the tragedy heard what he termed an explo-

sion and saw the truck leave the highway as if it had been picked up and thrown from the road. The drive shaft of the truck was broken and detached from it. It was upright with one end in the shoulder of the highway a considerable distance east of where the truck came to rest. The dual wheels on the rear of the truck were broken off and were hanging on the south side of it.

The shoulders of the road were wet and muddy. There were wheel and skid marks for 50 feet east of the truck, for the next 6 feet eastward there were none, and for an additional distance of 57 feet there were tire marks on the surface of the road. At the extreme east end of the 57 feet there was debris consisting of chrome strips, pieces of battery casing, and broken glass in the north lane of the highway but none in the south lane. The distance from the debris to where the truck stopped was 147 feet.

The car of defendant was substantially destroyed. It is not easily understandable how anyone could have been riding in the driver's position or at all in the car and survived. The convertible top of the car was not collapsed. It was broken down on and into the body of the car by the collision. The distance from the debris and where the skid marks first appeared southwesterly to where the car went into the ditch on the south side of the road was 141 feet, and it thereafter traveled 101 feet. The total distance it went from the probable place of the collision was 242 feet. The distance from the debris in the north lane of the highway to the center driveway at the White Spot Service Station was 603 feet.

Immediately after the accident Carlson was on the passenger or right side of the front seat of the car. He was leaning to the right against the door which was partly open and the upper part of his body was hanging out of the car. He was dead. He had light or blond hair. Blood and blond hair were found on the post on the right front of the car. A man with dark hair was

found in the front seat of the car almost but not wholly behind and under the steering post and wheel. He was afterwards identified as the defendant. He regained consciousness as the first person reached the car after the accident. Defendant was saying " 'Don't, honey. Don't, honey.'—like that." His right foot was between the clutch and the brake pedals. The front door on the left side of the car was forced open and his foot was loosened. The steering wheel had been bent downward and was against the defendant. It was pried upward and the defendant was removed from the car and taken to a hospital at Kearney. Alcohol was detected on the breath of defendant and in the car. There were drinking glasses, pop bottles, bottle openers, whisky bottles, beer bottles, and chlorophyll mints in the car.

The defendant and Carlson left Holdrege about 3 p. m., May 15, 1954, on an adventure to Grand Island and met two lady friends at the race track. They had 5 or 6 drinks before about 7 p. m. when they retired to the Sunset Motel where the ladies were staying and had highballs. Their liquor supply was not adequate to their demands and Carlson left to secure a supply of whisky. They met later, had dinner, and thereafter visited numerous night spots. The frequency or continuity of their indulgence in intoxicating liquor was remarkable. There was some unpleasantness and the ladies left defendant and Carlson about 2:30 a. m. at the Top Hat but they stayed there until 2:45 a. m. They then went to the Sunset Motel to see the girls and "give them a social call * * *." When they left there on the trip back to Holdrege Carlson was in the front seat alone and was driving the car, and defendant was lying on the back seat.

The defendant said he went to sleep a few minutes after they left the Sunset Motel in Grand Island and that he was not conscious of anything thereafter until about 9:30 a. m. when he realized that he was in a hospital in Kearney. He did not drive his car from the time they

left the race track in Grand Island about 7 p. m. the night before until after the accident. The car was driven by Carlson during this period. Defendant did not deny that he and Carlson were on an intensive drinking experience during the afternoon and night preceding the accident. Defendant denied that he gave consent to anyone that a specimen of his blood might be taken for a test of the alcoholic content of it; that he was not to his knowledge asked concerning this; that he did not tell the sheriff of the county that he was driving his car at the time of the collision; and that he had no recollection of being asked concerning this. He claims inability to have given binding consent or to have made any responsible statement at the time the sheriff claims to have talked with him at the hospital because of his condition resulting from his injuries, shock, and injections of morphine. The injuries defendant suffered in the accident were the fractures of the bones of each arm and an abrasion on the forehead between his eyes.

The sheriff claims he talked with defendant at the hospital at 6 a. m., about 2 hours after the accident; that defendant told him he was driving the car; that defendant then gave permission for a specimen of blood to be taken from his body and tested for its alcoholic content; that a specimen of blood was taken by the attending physician, placed in a container, and delivered to the sheriff; and that he retained it in his possession until he delivered it to the person in charge of the city and county public health laboratory in Grand Island. The person to whom the specimen of blood was delivered by the sheriff had a permit from the Department of Health of the state authorizing him to make body fluid tests and he was qualified to make such tests. He made an examination and test of the specimen of blood immediately after it was placed in his custody at about 10:45 a. m., May 17, 1954, the day after the accident, and he found thereby that the alcoholic content in the blood specimen was 0.24 percent by weight.

An examination of the body of Carlson established that he had two severely blackened eyes with hemorrhage into the eyeball structure; that areas on his head had the skin and underlying tissue dug out; that in the left temple there was a cut through the scalp starting on the hair line on the left and extending posteriorly to the bregma; that there was a depressed fracture beginning immediately above the left eye, extending backward about 3 centimeters above the hair line, and extending to the left and to the right so that there was an island of bone tissue about $4\frac{1}{2}$ inches long completely broken off of the skull structure and depressed inward; that there were, continuous with the posterior portion of the depressed island of bone, several radiating radial fractures through the bone like spokes of a wheel; that there were deep severe cuts on both knees and the kneecap of the right knee had a complete transverse fracture; that there was no skin discoloration on the chest; that the sternum and ribs were intact; and that there were no injuries to the abdomen. The opinion of the physician who made the examination was that the death of Carlson was caused by a compound depressed fracture of the skull with laceration of the brain substance.

Defendant argues that the proof is insufficient to sustain the verdict because it does not show, as the law requires, that defendant was operating a motor vehicle at the time of the accident which caused the death of Carlson; that the statement claimed to have been made by defendant in the hospital after the accident that he was driving the car does not have sufficient probative force to justify conviction; and that it was not made to appear that defendant at the time it was claimed he made the admission had ability to make a rational or binding statement. If the statement attributed to defendant was the only evidence of the fact that he was operating the motor vehicle it would be insufficient. There is proof of other facts and circumstances: The

position of defendant in the car after the accident; the position of the only other passenger in the car; the nature and location of the injuries Carlson received; the blood and light or blond hair on the doorpost of the car in front of where he was found in the car; and the fact that he had light or blond hair and that the hair of defendant was dark. In Fisher v. State, 154 Neb. 166, 47 N. W. 2d 349, it is said: "Extrajudicial admissions or a voluntary confession is insufficient to prove that a crime has been committed, but either or both are competent evidence of the fact and may, with corroborative evidence or circumstances, establish the corpus delicti and guilty participation of the defendant." See, also, Vanderheiden v. State, 156 Neb. 735, 57 N. W. 2d 761.

There is conflict in the evidence concerning the condition of defendant after the accident when it is said he talked with the sheriff. There is proof that he was conscious when being taken to the hospital and that he asked the men with him if he was being taken to jail. The sheriff did not notice the defendant was incapacitated to understand and talk. The doctor who was administering to defendant was present and he did not protest the desire of the sheriff to converse with the defendant. The doctor by taking the specimen of blood from the body of defendant after the conversation evidenced his belief in the sufficiency of the assent thereto given by the defendant. In any event it was the privilege and duty of the jury to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, and weigh the evidence. The conclusion of the jury may not be disturbed unless it is clearly wrong. Fisher v. State, *supra,* states the rule: "The credibility of witnesses and the weight of their testimony are for the jury to determine in a criminal case, and the conclusion of the jury cannot be disturbed unless it is clearly wrong." The trial court properly denied the motion of defendant to dismiss

the case on the ground of insufficiency of evidence.

The admissibility of evidence of the result of an examination and test of a specimen of blood taken from the body of defendant is challenged. The proof concerning consent of defendant to the taking of a specimen of his blood for a test of its alcoholic content is conflicting. The State produced proof that he did give his consent thereto. The defendant denies that he gave such permission and asserts his mental incapacity to do so at that time. The evidence concerning this has been sufficiently stated above. The requirements as to conditions of relevancy in point of time, tracing, and identification of the specimen of the blood, the accuracy of the analysis of it, and the qualification of the person who made the examination and test and who testified concerning it were shown to have been observed. Otherwise stated a sufficient foundation was established for the admission of the result of the test if it was competent evidence in the case. In a case in which there was a conviction for the crime of motor vehicle homicide and foundational requirements were conceded, this court said that evidence of this character was admissible on the issue of the intoxication of the defendant at the time it was charged he committed the offense. Vore v. State, 158 Neb. 222, 63 N. W. 2d 141. It is quite generally considered that if the intoxication of a person is important in litigation evidence as to the taking of a specimen of body fluid of the person in question and of the alcoholic content of the specimen as determined by analysis, and expert opinion evidence as to intoxication based upon the result of the presence of such alcohol in the system of the person are admissible against him. Annotations, 127 A. L. R. 1513, 159 A. L. R. 209.

The court by instruction No. 14 advised the jury that if it found from the evidence concerning the analysis of the blood of the defendant that there was 0.15 percent or more by weight of alcohol in it there was a presumption of law that he was under the influence of alcoholic

liquor at the time the specimen of blood was procured from him but that the presumption was not conclusive of the fact. The defendant contests the legality of this part of the charge to the jury. The legislative act providing that a presumption results that the operator of a motor vehicle is under the influence of intoxicating liquor from a determination that the amount of alcohol in the body fluid of the operator at the time in question is 0.15 percent or more by weight as shown by chemical analysis is in derogation of the common law and it must be strictly interpreted and applied as limited by its terms. § 39-727.01, R. R. S. 1943; Vore v. State, *supra*. The unequivocal language of the act limits its application to a criminal prosecution of a person for operating or being in the actual physical control of a motor vehicle while under the influence of alcoholic liquor or of any drug. The first sentence thereof contains this language: "In any criminal prosecution for a violation of section 39-727 relating to driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's body fluid at the time alleged, as shown by chemical analysis of the defendant's blood, spinal fluid, or urine, shall give rise to the following rebuttable presumptions:  * * * (3) If there was 0.15 per cent or more by weight of alcohol in the defendant's blood, spinal fluid, or urine, it shall be presumed that the defendant was under the influence of intoxicating liquor at the time the specimen was taken." § 39-727.01, R. R. S. 1943. The section of the statute described in the foregoing says: "It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle while under the influence of alcoholic liquor or of any drug. Any person who shall operate or be in actual physical control of any motor vehicle while under the influence of alcoholic liquor or of any drug shall be deemed guilty of a crime * * *." § 39-727, R. S. Supp., 1953.

The crime of motor vehicle homicide and the crime

of having possession or operating a motor vehicle while under the influence of intoxicating liquor or a drug are separate and distinct crimes created by independent and complete acts by the Legislature. It is presumed that the Legislature acted with knowledge and purpose in limiting the application of section 39-727.01, R. R. S. 1943, to a prosecution for a violation of section 39-727, R. S. Supp., 1953. This presumption is contributed to by the fact that section 39-727.01, R. R. S. 1943, providing for a body fluid test and the effect of the result thereof, and section 28-403.01, R. S. Supp., 1953, creating the crime of motor vehicle homicide, were enacted at the same session of the Legislature. It is not probable that it would have overlooked the latter section if it intended the former section should have application to a prosecution by virtue of the latter. A determination that the provisions of section 39-727.01, R. R. S. 1943, have application to a prosecution for the crime of motor vehicle homicide, notwithstanding the unambiguous language of the section to the contrary, would not be a strict interpretation of its terms and the limitation expressly contained therein, but would be judicial legislation of the most obvious character. The instruction complained of submitted to the jury inapplicable extraneous matter, it was contrary to law, and its inclusion in the charge to the jury was error.

The evidence is not conclusive that the defendant was under the influence of intoxicating liquor at the time of the accident. There is no direct testimony that he was. The first person to the car of defendant after the accident did not detect any odor of liquor. The sheriff was at the place of the accident. Soon thereafter he went to the hospital and talked with the defendant. He did not detect or observe any evidence of the defendant being under the influence of liquor. The sheriff said the defendant was coherent and spoke as a normal person. The jury was permitted to and may have concluded from instruction No. 14 concerning the presumption

arising from the result of the test of the blood of defendant that he was under the influence of intoxicating liquor at the time of the accident and was thereby then unlawfully operating a motor vehicle which caused the death of Carlson, and hence defendant was guilty of motor vehicle homicide. In any event it cannot be ascertained from the record that the jury was not improperly influenced by the instruction or that the defendant was not thereby prejudiced. It must therefore be determined that the giving of instruction No. 14 permitted the defendant to be convicted of a crime contrary to law and that it was prejudicial error. Jacox v. State, 154 Neb. 416, 48 N. W. 2d 390; Borden v. General Insurance Co., 157 Neb. 98, 59 N. W. 2d 141.

The conviction and judgment should be and they are reversed and the cause is remanded to the district court for Buffalo County for further proceedings according to law.

REVERSED AND REMANDED.